## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| **JANICE R. BENNETT,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 12-CV-238-PJC** |
| | ) | |
| **CAROLYN W. COLVIN,** | ) | |
| **Acting Commissioner of the** | ) | |
| **Social Security Administration,**[1] | ) | |
| | ) | |
| **Defendant.** | ) | |

## OPINION AND ORDER

Claimant, Janice R. Bennett ("Bennett"), pursuant to 42 U.S.C. § 405(g), requests judicial review of the decision of the Commissioner of the Social Security Administration ("Commissioner") denying Claimant's application for disability benefits under the Social Security Act, 42 U.S.C. §§ 401 *et seq*. In accordance with 28 U.S.C. § 636(c)(1) and (3), the parties have consented to proceed before a United States Magistrate Judge. Any appeal of this order will be directly to the Tenth Circuit Court of Appeals. Claimant appeals the decision of the Administrative Law Judge ("ALJ") and asserts that the Commissioner erred because the ALJ incorrectly determined that Claimant was not disabled. For the reasons discussed below, the Court **REVERSES AND REMANDS** the Commissioner's decision.

---

[1] Pursuant to Fed. R. Civ. P. 25(d)(1), Carolyn W. Colvin, the current Acting Commissioner of the Social Security Administration, is substituted for Michael J. Astrue as Defendant in this action. No further action need be taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

## Claimant's Background

Bennett was 59 years old at the time of the hearing before the ALJ on August 3, 2012. (R. 30).  She had completed school through the eighth grade.  (R. 35).  Her last job was at a hatchery in 2007.  (R. 36).  It required her to lift 25-50 pounds at a time.  *Id*.  She held that job on and off for six months, working three to four days per week.  *Id*.  Previously, she had been employed in numerous blue-collar capacities, such as working on an assembly line, building furniture, stocking meat at a grocery store, and doing janitorial work.  (R. 41-42).

Bennett testified that she became disabled in September of 2007.  *Id*.  She stated that she could not do "anything for very long without hurting [her] back."  (R. 31).  Bennett said that she suffered from crippling arthritis, bronchitis, a hiatal hernia, and migraine headaches.  *Id*.

Bennett testified that her arthritis affected all of her extremities.  (R. 31-32).  She stated that it caused her pain, prevented her from bending over, sitting, or walking for prolonged periods of time, and kept her awake at night.  *Id*.  She said that she could not sit or stand for more than two to three hours per day and only for a maximum of 30 minutes at a time.  (R. 31-33). She said that she had difficulties doing household chores.  (R. 33-34).

Bennett testified that bronchitis prevented her from breathing properly, which resulted in shortness of breath and feelings of faintness.  (R. 34).  She did not smoke, but her husband smoked outside of the house.  *Id*.  She used a prescribed inhaler.  *Id*.  She stated that after walking one block, she experienced shortness of breath.  *Id*.

Bennett testified that she had a hiatal hernia and that the arthritis medication caused it to bleed.  (R. 35).  The bleeding resulted in her having to undergo two blood transfusions, each involving seven units of blood.  *Id*.  Consequently, her physician, Dr. Tucker, ordered her not to take any drugs for her arthritis-related pain unless she "absolutely" needed them.  (R. 35-36).

Bennett also testified that she suffered from migraine headaches.  (R. 39). Altering her diet had reduced the frequency of her migraines from occurring daily to once or twice per month.  *Id*.

Due to her physical condition, Bennett said that she could not lift more than five pounds without experiencing back pain.  *Id*.  She described that holding her hands out, such as to work on an assembly line, for 30 minutes or more would result in similar pain.  *Id*.

Physicians of Gravette Medical Associates Ltd. began treating Bennett in 1988.  (R. 389-425).  Bennett was seen for pain-related issues in 1988.  (R. 420).  On June 3, 1990, Bennett was hospitalized, treated for acute gastroenteritis, and released two days later.  (R. 421).

On January 31, 1997, Bennett had a CT scan following a concussion.  (R. 418).  Nothing remarkable was discovered.  *Id*.

On June 6, 1997, Dr. Kenneth Poemoceah treated Bennett for "severe abdominal discomfort."  *Id*.  An exam showed epigastric tenderness, and Prevacid was prescribed.  *Id*.  Elevated blood pressure was also noted.  *Id*.

Dr. Kenneth Poemoceah treated her for high blood pressure on June 12, 1997.  *Id*.  Inderal LA[2] was prescribed for daily use.  *Id*.  Bennett also complained of tingling in her left shoulder.  *Id*.

On February 16, 2000, Bennett complained to Dr. Billy Hall of weakness in her legs.  (R. 412).  She was admitted to the hospital.  *Id*.  An esophagogastroduodenoscopy[3] with biopsies was performed.  *Id*.  She was diagnosed with a duodenal ulcer with hemorrhage, and recurrent

---

[2] Inderal LA is a drug used for "Management of [hypertension], angina pectoris due to coronary atherosclerosis, and hypertrophic subaortic stenosis.  Common migraine headache prophylaxis."  PDR.net.

[3] An esophagogastroduodenoscopy is an "endoscopic examination of the esophagus, stomach, and duodenum."  Dorland's Illustrated Medical Dictionary 655 (29th ed. 2000).

secondary anemia.  *Id*.  She was prescribed Prevacid and antibiotics.  *Id*.  Bennett was released

four days later.  *Id*.

On September 5, 2000, Bennett saw Dr. Hall for abdominal pain.  *Id*.  She was admitted

to the hospital for a hiatal hernia[4] and erosive esophagilia.[5]  (R. 410).  She was referred to Dr.

Michael Platt who discovered a fixed gastric herniation.  (R. 387).  Bennett was prescribed

Prevacid and Limbrel, [6]  and she was released two days later.  (R. 410).

On June 2, 2003, Bennett saw Dr. Hall due to coughing, shortness of breath, and pain in

her back.  (R. 405).  She was diagnosed with acute bronchitis and treated with prescription

antibiotics and other medications.  *Id*.

On July 18, 2003, Dr. Poemoceah treated Bennett for headaches.  (R. 404).  He

prescribed Inderal and Toradol.  *Id*.

On June 4, 2004, Bennett was taken to the emergency room for back, neck, and head

pain.  (R. 403).  She was diagnosed with hypertension, but other details are hand written and

undecipherable. *Id*.

---

[4] Hiatal hernia is a "protrusion of the stomach upward into the mediastinal cavity through the esophageal hiatus of the diaphragm."  Taber's Cyclopedic Medical Dictionary 891 (17th ed. 1989).

[5] Esophagilia is "pain in the esophagus that is able to produce erosion."  Taber's Cyclopedic Medical Dictionary 670, 676-77 (17th ed. 1989).

[6] Limbrel is a drug used for "clinical dietary management of the metabolic processes of osteoarthritis."  PDR.net.

On March 14, 2005, Bennett saw Dr. Hall due to pain in her right ear and the right side of her neck, and due to sore glands.  (R. 382).  He diagnosed her with pharyngitis,[7] lymphadenitis[8] of her right neck, and hypertension.  *Id*.  He prescribed Cefaclor and gave Bennett samples of Benicar.[9]  *Id*.  He told her to return after one month if necessary.  *Id*.

On November 29, 2007, Dr. Poemoceah saw her for a blood-pressure check.  (R. 398). No acute distress was evident, although elevated blood pressure was noted.  *Id*.  Dr. Poemoceah assessed her with hypertension.  *Id*.  He prescribed Lisinopril,[10] and told her to come back in one month.  *Id*.  Bennett was also given a blood-pressure cuff, so she could check her blood pressure at home.  *Id*.

On December 5, 2007, Dr. David Tucker saw Bennett for upper back pain.  (R. 396-97). He noted tenderness of the parathoracic spine.  (R. 396).  Dr. Tucker diagnosed Bennett with degenerative joint disease of the spine and with thoracic strain.  *Id*.  He prescribed Flexeril and Voltaren and gave exercises to do at home.  *Id*.  He told Bennett to return if the pain persisted. *Id*.

That same day Dr. Tucker admitted Bennett to Siloam Springs Memorial Hospital because of abdominal pain.  (R. 244).  She was diagnosed with a benign growth on an ovary, and

---

[7] Pharyngitis is "inflammation of the pharynx."  Taber's Cyclopedic Medical Dictionary 1489 (17th ed. 1989).

[8] Lymphadenitis is inflammation of lymph nodes.  Taber's Cyclopedic Medical Dictionary 1141 (17th ed. 1989).

[9] Benicar is a drug used for treatment of hypertension.  PDR.net.

[10] Lisinopril is a drug used for treatment of hypertension.  PDR.net.

the ovary was removed by laparoscopic surgery.  (R. 243-44).  She had secondary diagnoses of hypertension, hematuria,[11] diaphragmatic hernia,[12] and esophageal reflux.[13]  *Id.*

Dr. Tucker saw Bennett again on January 3, 2008 to check on her back pain and blood pressure.  (R. 395).  He noted that she was doing fairly well, and her blood pressure was "fairly" well under control.  *Id.*  She was prescribed Skelaxin and Mobic.  *Id.*

On April 28, 2009, Bennett saw Dr. Tucker for a cough.  (R. 391-92).  He diagnosed Bennett with wheezing and acute bronchitis, and he prescribed several medications.  *Id.*

On May 18, 2009, Bennett saw Dr. Tucker and complained of chronic back pain, tenderness, and discomfort, and she said she had difficulty bending, lifting, and twisting.  (R. 426-27.

Dr. Tucker wrote a letter dated June 1, 2009 addressed "To Whom It May Concern" stating in part the following:

> [Bennett] has been seen intermittently in the past for thoracic strain and some degenerative disease of the thoracic spine.  I am unaware of any diagnostic tests or therapy she has undergone.  She has been advised to avoid repetitive lifting and bending, but as far as I can tell in her records no other restrictions have been placed on her and she would need further testing and therapy to know the extent of her back problems and its effects on her functionality.  *Id.*

(R. 429).

Dr. Tucker completed a Medical Source Statement ("MSS") form dated June 10, 2009. (R. 430-32).  In the MSS, Dr. Tucker indicated that during an eight-hour workday, Bennett could sit for a maximum of one hour at a time and walk or stand for a maximum of 30 minutes at a

---

[11] Hematuria is "[b]lood in urine." Taber's Cyclopedic Medical Dictionary 870 (17th ed. 1989).

[12] A diaphragmatic hernia is a "[c]ongenital or traumatic protrusion of abdominal contents through the diaphragm." Taber's Cyclopedic Medical Dictionary 539 (17th ed. 1989).

[13] Esophageal reflux is a "return or backwards flow" of "gastric contents into the esophagus." Taber's Cyclopedic Medical Dictionary 1690 (17th ed. 1989).

time.  (R. 430).  He also indicated that during an eight-hour workday, she could sit for four hours total, stand for three hours total, and walk for two hours total.  *Id*.  A hand-written comment after this section of the form appears to state that Bennett could only do sedentary work.  *Id*.  Additionally, Dr. Tucker indicated that Bennett could never lift or carry more than 21 pounds, could occasionally lift up to 20 pounds, could frequently lift up to 10 pounds, and continuously lift less than 5 pounds.  (R. 431).  She could never bend, squat, crawl, or climb, and her ability to reach was limited.  *Id*.  She was "totally" restricted from engaging in activities involving unprotected heights, "moderately" restricted from engaging in activities located around moving machinery, and "mildly" restricted from engaging in activities involving vibrations.  (R. 431-32).  Dr. Tucker stated that his evaluation was based upon physical examination of Bennett.  (R. 432).  Another hand-written comment said, "needs further testing" in response to a question regarding objective medical findings.  *Id*.

On August 26, 2009, Dr. Tucker examined Bennett and found that she had some elements of chronic obstructive pulmonary disease ("COPD").  (R. 463).  Her symptoms included shortness of breath, weakness, and fatigue.  (R. 464).  She was prescribed inhalants. *Id*.

On October 21, 2009, Bennett was admitted to the urgent care wing of Doctors Hospital of Springfield for abdominal pain relating to her hiatal hernia.  (R. 446).  Three blood infusions were required to treat her.  (R. 459-61).

As part of the disability process, an x-ray of Bennett's lumbar spine was taken on March 7, 2009.  (R. 364).  The reviewing physician found that Bennett had good alignment in her lumbosacral spine, well maintained disc space, and "very minimal" osteophytes at the L-5 level. *Id.*

Agency consultant Dr. Mohammed Quadeer examined Bennett on March 19, 2009.  (R. 365-71).  Dr. Quadeer stated that Bennett reported having upper and lower back pain at the time of the consultation, as well as pain associated with muscle spasms.  (R. 365).  On examination, Bennett's cervical and thoracic spine had full ranges of motion and no tenderness.  (R. 367).  Her "lumbar-sacral spine [was] tender at the level of T9 to T11 with full range of motion associated with slight muscle spasms."  *Id*.  Straight leg raises were negative.  *Id*.  Dr. Quadeer assessed Bennett with having a history of:

> (1) Pain in the upper and lower back with tenderness present at T9 to T11 and associated with muscle spasms at the lower thoracic and upper lumbar region.
>
> (2) Arthritis in the back diagnosed by a physician.  Pain is probably due to degenerative arthritis of the lumbar spine and thoracic spine.  . . .

*Id*.

Nonexamining agency consultant Dr. Janet Rodgers completed a Physical Residual Functional Capacity Assessment dated April 19, 2009.  (R. 372-79).  For exertional limitations, Dr. Rodgers said that Bennett could occasionally lift 50 pounds, could frequently lift 25 pounds, could stand or walk for about six hours in an eight-hour day, and could sit for about six hours in an eight-hour day.  (R. 373).  In the portion of the form for narrative explanation, Dr. Rodgers reviewed Bennett's claims of disability and her reported activities of daily living.  (R. 373-74).  She briefly discussed Bennett's treatment for degenerative joint disease, the x-ray of her back, and Dr. Quadeer's report of March 2009.  *Id*.

For postural limitations, Dr. Rodgers found that Bennett could frequently climb stairs, ramps, ladders, ropes, and scaffolds.  (R. 374).  She could frequently balance, kneel, crouch and crawl.  *Id*.  She could occasionally stoop.  *Id*.  Dr. Rodgers found that no manipulative, visual, environmental, or communicative limitations were established.  (R. 375-76).  Dr. Rodgers

8

checked a box on the form indicating that there was no treating physician source statement in the file.  (R. 378).

On June 16, 2009, nonexamining agency consultant Dr. Thurma Fiegel completed a second Physical Residual Functional Capacity Assessment.  (R. 434-41).  For exertional limitations, Dr. Fiegel said that Bennett could occasionally lift 50 pounds, could frequently lift 25 pounds, could stand or walk for about six hours in an eight-hour day, and could sit for about six hours in an eight-hour day.  (R. 435).  In the portion of the form for narrative explanation, Dr. Fiegel reviewed Bennett's claims of disability. (R. 435-36).  She briefly discussed Bennett's treatment for degenerative joint disease, the x-ray of her back, her hypertension, and her ovarian mass.  *Id.*  She also described Bennett's normal gait, full range of motion, and lack of back surgeries.  *Id.*

For postural limitations, Dr. Fiegel found that Bennett could frequently climb stairs, ramps, ladders, ropes, and scaffolds.  (R. 436).  Bennett could frequently balance, kneel, crouch and crawl.  *Id.*  She could occasionally stoop.  *Id.*  Dr. Fiegel found that no manipulative, visual, environmental, or communicative limitations were established.  (R. 437-38).  Dr. Fiegel wrote that Dr. Tucker's MSS reflected more severe limitations than his letter.  (R. 440).  Dr. Fiegel then wrote that "attempts to contact [Dr. Tucker] to clarify the conflict [were] not successful." *Id.*  Dr. Fiegel said that there was no evidence that Bennett had any limitation beyond the RFC findings that Dr. Fiegel found in her assessment.  *Id.*

### Procedural History

Bennett filed applications in October of 2008 for disability benefits and supplemental security income benefits under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401 *et seq.*  (R. 102-05).  The applications were denied initially and upon reconsideration.  (R. 51-58,

62-67).  A hearing before ALJ Lantz McClain was held on July 9, 2010.  (R. 27-45).  By

decision dated August 16, 2010, the ALJ found that Bennett was not disabled.  (R. 14-24).  On

March 1, 2012, the Appeals Council denied review of the ALJ's findings.  (R. 1-5).  Thus, the

decision of the ALJ represents a final decision for the purposes of this appeal.  20 C.F.R. §§

404.981, 416.1481.

### Social Security Law and Standard of Review

Disability under the Social Security Act is defined as the "inability to engage in any

substantial gainful activity by reason of any medically determinable physical or mental

impairment." 42 U.S.C. § 423(d)(1)(A).   A claimant is disabled under the Act only if his

"physical or mental impairment or impairments are of such severity that he is not only unable to

do his previous work but cannot, considering his age, education, and work experience, engage in

any other kind of substantial gainful work in the national economy."  42 U.S.C. § 423(d)(2)(A).

Social Security regulations implement a five-step sequential process to evaluate a disability

claim.  20 C.F.R. § 404.1520.[14]  *See also Williams v. Bowen*, 844 F.2d 748, 750 (10th Cir. 1988)

---

[14] Step One requires the claimant to establish that he is not engaged in substantial gainful
activity, as defined by 20 C.F.R. § 404.1510.  Step Two requires that the claimant establish that
he has a medically severe impairment or combination of impairments that significantly limit his
ability to do basic work activities.  *See* 20 C.F.R. § 404.1520(c).  If the claimant is engaged in
substantial gainful activity (Step One) or if the claimant's impairment is not medically severe
(Step Two), disability benefits are denied.  At Step Three, the claimant's impairment is compared
with certain impairments listed in 20 C.F.R. Pt. 404, Subpt. P, App.1.  A claimant suffering from
a listed impairment or impairments "medically equivalent" to a listed impairment is determined
to be disabled without further inquiry.  If not, the evaluation proceeds to Step Four, where the
claimant must establish that he does not retain the residual functional capacity ("RFC") to
perform his past relevant work.  If the claimant's Step Four burden is met, the burden shifts to
the Commissioner to establish at Step Five that work exists in significant numbers in the national
economy which the claimant, taking into account his age, education, work experience, and RFC,
can perform.  *See Dikeman v. Halter*, 245 F.3d 1182, 1184 (10th Cir. 2001).  Disability benefits
are denied if the Commissioner shows that the impairment which precluded the performance of
past relevant work does not preclude alternative work. 20 C.F.R. § 404.1520.

(detailing steps).  "If a determination can be made at any of the steps that a claimant is or is not disabled, evaluation under a subsequent step is not necessary." *Id.*

Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. § 405(g).  This Court's review is limited to two inquiries: first, whether the Commissioner's decision was supported by substantial evidence; and, second, whether the correct legal standards were applied.  *Hamlin v. Barnhart*, 365 F.3d 1208, 1214 (10th Cir. 2004) (quotation omitted).

Substantial evidence is such evidence as a reasonable mind might accept as adequate to support a conclusion.  *Id.*  The court's review is based on the record taken as a whole, and the court will "meticulously examine the record in order to determine if the evidence supporting the agency's decision is substantial, taking 'into account whatever in the record fairly detracts from its weight.'" *Id.* (*quoting Washington v. Shalala*, 37 F.3d 1437, 1439 (10th Cir. 1994)).  The court "may neither reweigh the evidence nor substitute" its discretion for that of the Commissioner.  *Hamlin,* 365 F.3d at 1214 (quotation omitted).

## Decision of the Administrative Law Judge

The ALJ found that Bennett met the insured status requirements of the Social Security Act through March 31, 2011.  (R. 19).  At Step One, the ALJ determined that Bennett had not engaged in substantial gainful activity since her alleged onset date of December 2, 2007.  *Id*.  At Step Two, the ALJ found that Bennett had severe impairments of degenerative disc disease of the spine, COPD, and hypertension.  *Id*.  At Step Three, the ALJ found that Bennett's impairments, or combination of impairments, did not meet any Listing.  (R. 19-20).

The ALJ determined that Bennett had the RFC to perform the full range of medium work. (R. 21).  At Step Four, the ALJ found that Bennett had the ability to perform her past relevant

work.  (R. 23).  Thus, the ALJ found that Bennett had not been disabled since December 2, 2007.
*Id.*

## Review

Bennett argues that the ALJ erred in failing to properly consider the medical-source opinions, erred in finding that Bennett could return to her past relevant work, and erred in his credibility assessment.  Plaintiff's Opening Brief, Dkt. #14, p. 1.  The Court agrees with Bennett that the ALJ failed to properly consider the opinions given by treating physician Dr. Tucker.  Because reversal is required on this issue, the other issues raised by Bennett are not considered.

Regarding opinion evidence, generally the opinion of a treating physician is given more weight than that of an examining consultant, and the opinion of a nonexamining consultant is given the least weight.  *Robinson v. Barnhart*, 366 F.3d 1078, 1084 (10th Cir. 2004).  An ALJ must consider the opinion evidence and, if he rejects it, he must provide specific legitimate reasons for the rejection.  *Doyal v. Barnhart*, 331 F.3d 758, 763-64 (10th Cir. 2003); *Victory v. Barnhart*, 121 Fed. Appx. 819, 825 (10th Cir. 2005) (unpublished).  So long as the ALJ gives good reasons for the weight he gives to treating medical opinions, nothing more is required.  *Oldham v. Astrue*, 509 F.3d 1254, 1258 (10th Cir. 2007).

Here, the ALJ's comments regarding Dr. Tucker's opinions were very brief.  After describing Dr. Tucker's June 1, 2009 "To Whom It May Concern" letter, the ALJ said:

> [Dr. Tucker] then completed a Medical Source Statement.  The doctor contradicts himself within the form and his letter.  The doctor commented that the claimant could only perform sedentary work.  He then stated that the claimant could lift 20 pounds occasionally and 10 pounds frequently and stand/walk a total of 6 hours.  The form is inconsistent internally as well as inconsistent with [the June 1, 2009 letter].

(R. 22).  While the ALJ in this discussion of Dr. Tucker's opinion evidence did not expressly assign a weight, it can be inferred that the ALJ completely rejected all of Dr. Tucker's opinions

because he found that Bennett had the RFC to perform the full range of medium work.  (R. 21).

The question, then, is whether the paragraph quoted above meets the standard of giving "specific

legitimate reasons" for rejecting a treating physician opinion, and the undersigned finds that it

does not meet this standard.

The ALJ's paragraph only contains one explicit reason for rejecting Dr. Tucker's

opinions, in that he explained that lifting 20 pounds occasionally and 10 pounds frequently,

together with standing and walking for a total of six hours were inconsistent with Dr. Tucker's

hand-written comment that Bennett could do only sedentary work.  (R. 22).  The undersigned

finds that the doctor's comments do not create an inconsistency and that therefore this is not a

reason that supports rejection of the MSS form.  First, the ALJ was incorrect in stating that Dr.

Tucker found that Bennett could stand or walk for a total of six hours.  What Dr. Tucker actually

indicated by circling numbers on the MSS form was that Bennett could stand for three hours

total, but only 30 minutes at a time, and walk for two hours, but only 30 minutes at a time.  (R.

430).  Therefore, Dr. Tucker's hand-written note that Bennett could only do sedentary work

appears to have been an explanation that sedentary work was the only work compatible with

these limitations, in the doctor's medical opinion.  Dr. Tucker's findings regarding total time for

walking and standing add up to five hours, and therefore the ALJ's statement that Dr. Tucker

found Bennett could walk and/or stand for six hours a day is incorrect.  This incorrect statement

about Dr. Tucker's findings does not create an inconsistency.

Dr. Tucker's findings that Bennett could frequently lift 10 pounds and could occasionally

lift 20 pounds also does not create an inconsistency, even though those lifting abilities are

compatible with work at the "light" exertional level.  Dr. Tucker's comment that Bennett could

only do sedentary work was written in a space after his limitations on sitting, standing, and

walking, and therefore it appears that Dr. Tucker was stating that his limitations on those functions were the basis of his comment.  The fact that Dr. Tucker found lifting limitations that were compatible with a level of exertion greater than sedentary does not detract from his opinion that Bennett's limitations in sitting, walking, and standing limited her to sedentary work.

While the ALJ stated that the MSS was inconsistent with the June 1, 2009 letter, he does not explain what this inconsistency is.  (R. 22).  The undersigned does not find any inconsistency between the two documents.  In the letter, Dr. Tucker stated that the only restrictions placed on Bennett were to avoid repetitive lifting and bending.  (R. 429).  The MSS form, by contrast, asked Dr. Tucker for his opinion of how Bennett's "physical ability to perform work related activities on a sustained basis, in a work setting, would be limited."  (R. 430).  Thus, these were not restrictions Dr. Tucker placed upon Bennett, but rather his judgments of what her abilities were.  For example, the undersigned does not recall an instance in which a physician told a patient to only sit for a period of 30 minutes at one time.  Failure to place a restriction on how long to sit, however, does not prevent a physician from legitimately giving an opinion that the patient was limited to sitting for only 30 minutes at one time.

The undersigned believes that the ALJ may have picked up the idea that there was a conflict between the letter and the MSS from Dr. Fiegel's form where she stated that the MSS was more restrictive than the letter and that attempts had been made to contact Dr. Tucker to "clarify the conflict."  (R. 440).  Again, even though Dr. Fiegel refers to this as a conflict, the undersigned does not find any conflict, and certainly no conflict that would justify rejection in total of Dr. Tucker's opinions.  It is natural that a treating physician would only put restrictions on such activities as repetitive lifting and bending, but when asked to give an opinion on abilities in other areas, might find additional limitations.  The ALJ did not give any explanation that

would justify a finding of a conflict between the MSS and the letter that could support a rejection of Dr. Tucker's opinion evidence.

The undersigned also rejects the Commissioner's argument that Dr. Tucker contradicted himself on the MSS when he said that Bennett could sit, stand, and walk for a combined nine hours per day, but could not work a typical eight-hour workday.  Defendant's Response Brief, Dkt. #15, p. 3.  Dr. Tucker checked "no" when asked if Bennett was "capable of working a typical eight-hour day or 40-hour work week."  (R. 430).  First, the ALJ did not cite this as the internal contradiction or inconsistency that he mentioned in his paragraph.  (R. 22).  Second, the undersigned finds no inherent conflict between the two opinions that the total time for the three activities of sitting, standing, or walking add up to more than eight hours and the opinion that the patient could not work a typical eight-hour day or 40-hour work week.

The Commissioner resorts to suggesting multiple post hoc rationales to attempt to save the ALJ's decision.  Defendant's Response Brief, Dkt. #15, pp. 3-5.  For example, the Commissioner says that Dr. Tucker admitted that he did not have objective medical evidence to support his opinions in the MSS because he wrote "needs further testing" on the form.  The ALJ did not rely on that rationale.  Neither did the ALJ reject Dr. Tucker's opinions because they were inconsistent with his treatment records, with the x-ray of Bennett's lumbar spine, or with Dr. Quadeer's consultative examination.  Judicial review of an agency decision is limited to the analysis offered in the ALJ's decision, and it is improper for a reviewing court to offer a "post-hoc rationale" in order to affirm.  *Carpenter v. Astrue*, 537 F.3d 1264, 1267 (10th Cir. 2008).

Because the issue of the opinion evidence of Dr. Tucker requires reversal, the undersigned does not address the remaining contentions of Bennett.  On remand, the

Commissioner should ensure that any new decision sufficiently addresses all issues raised by Bennett.

This Court takes no position on the merits of Bennett's disability claim, and "[no] particular result" is ordered on remand. *Thompson v. Sullivan*, 987 F.2d 1482, 1492-93 (10th Cir. 1993). This case is remanded only to assure that the correct legal standards are invoked in reaching a decision based on the facts of the case. *Angel v. Barnhart*, 329 F.3d 1208, 1213-14 (10th Cir. 2003), *citing Huston v. Bowen*, 838 F.2d 1125, 1132 (10th Cir. 1988).

**Conclusion**

Based upon the foregoing, the Court **REVERSES AND REMANDS** the decision of the Commissioner denying disability benefits to Claimant for further proceedings consistent with this Order.

Dated this 28th day of June 2013.

Paul J. Cleary
United States Magistrate Judge